## THE CITY OF ST. AUGUSTINE.

### HENDERSON et al. v. THE CITY OF ST. AUGUSTINE.

### ST. AUGUSTINE STEAMSHIP CO. v. HENDERSON et al.

(Circuit Court of Appeals, Second Circuit. May 28, 1895.)

COLLISION—STEAMER AND SAIL.

A steamer meeting a schooner in the open sea, at night, on nearly opposite courses, *held* in fault because, on perceiving the schooner's green light nearly straight ahead, she did not allow sufficient margin for passing, or for the usual and necessary variation in the schooner's course through yawing or leeway. 52 Fed. 237, affirmed.

Appeal from the District Court of the United States for the Southern District of New York.

This was a libel by William Henderson and others, claimants of the schooner Norman, against the steamer the City of St. Augustine, to recover damages for collision. The St. Augustine Steamship Company, claimant of the steamer, filed a cross libel against the schooner. The district court entered a decree in favor of the libelants against the steamer, and dismissing the cross libel. 52 Fed. 237. The claimants of the steamship appeal.

Geo. Bethune Adams, for appellants.

Harrington Putnam, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. The facts in the case which seem manifest, and which are stated for the most part in the language of the district judge, are as follows: At about half past 1 o'clock in the morning of November 25, 1891, the schooner Norman, of 367 tons, loaded with a cargo of lumber, bound from Savannah to Baltimore, and then heading about N. E., came in collision off the coast of North Carolina with the steamer City of St. Augustine, of 390 tons, bound southward upon a course S. W. ¾ W. The stem of the City of St. Augustine came in contact with the schooner's bowsprit, which, being broken at the knightheads, and carried away, their bows came in collision. The hull of the steamer was injured on her port side, 14 or 15 feet abaft the stem. The schooner's port bow was crushed in, the blow being from port to starboard. The schooner was so damaged that she filled, but did not sink, and was towed to Wilmington. The above libel and cross libel were filed to recover the respective damages.

The night was dark, but clear, with starlight. The wind was moderate, about N. N. W. The lights of both were properly set and burning. The steamer was going from eight to nine knots; the schooner, from four to five knots. About 14 minutes before the collision the green light of each was seen by the other a little on the starboard bow of each. "It is evident, therefore, that the schooner was at that time to the westward of the line of the steamer's course,

which was then also directed astern of the schooner; otherwise the steamer's red light must have been visible. But the schooner was making, doubtless, a half-point leeway, so that her actual course was very nearly opposite to that of the steamer. It was the duty of the steamer to keep out of the way of the sailing vessel. The excuse of the steamer for not doing so is that the schooner did not keep her course; but that, after having first turned to the eastward sufficiently to show her red light to the steamer (upon seeing which the steamer changed her course a point and a half to the westward, so as to bring the schooner's red light well upon the steamer's port bow), the schooner again changed her course to the westward, so as again to show her green light, whereupon the steamer put her course still more to the westward, until, at collision, she was heading about due west; and that the collision happened solely in consequence of the improper changes of course by the schooner. Such changes are denied by the schooner's witnesses."

The question upon whom the responsibility for this collision must rest is a most puzzling one. The mate, lookout, and wheelsman of the Norman were the persons on deck before and at the time of the collision. The mate gave his testimony orally, and the two others, both colored men, and not apparently of much intelligence, gave their depositions. Fowler, the second officer of the St. Augustine, and the lookout and wheelsman, both Swedes, were the persons in control of the navigation of the steamer just before the collision, and testified orally. The testimony of the Norman's witnesses is definite and positive that there was no change of course on her part, until a final one, in extremis, under a port wheel, just before the collision, and it is difficult to see why she should intentionally, and without apparent reason, have changed her course. On the other hand, Fowler, the second mate of the steamship, whose testimony forcibly suggests that he intended to act both with discretion and with caution, and his co-witnesses, who were intelligent men of their class, testify that when the red light of the schooner came into view the course of the steamer was altered from S. W. $\frac{1}{2}$ W. to W. S. W., and subsequently to W. by S., and subsequently to W., which was followed instantly by the order hard a-port; and that thus the officer in charge continually attempted to get away from the schooner. The last order the wheelsman does not recollect. The announcement of these successive orders was heard by one of the sailors who were below deck, and that they were given and obeyed cannot reasonably be doubted; but the question whether they were given to meet a continuous and material change of course on the part of the schooner is not settled thereby. The appellants relied before the district court, and still rely, as corroborative of their theory, upon the alleged fact that the angle of collision was a right angle. If this was true, it would go far to show that the schooner had changed her course at least $3\frac{1}{2}$ points to the westward, and thus had continuously baffled the attempt of the steamer to keep out of her way. But we concur with the district court that the appearance of the wounds on each vessel does not sustain the theory of

a right-angled collision. The testimony of the Wilmington port wardens, which was used before the commissioner, was to the effect that the blow upon the schooner was on the port bow, nearly head on. The injury to the steamer, about 14 feet abaft her stem on the port side, and the scraping of the schooner along the same side, are inconsistent with a right-angled blow. Apparently the bows of the two vessels came together at an angle of two or three points. It is manifest from the concurrent testimony from each vessel that the green light of the schooner was at first nearly straight ahead of the steamer. Our conclusion is that subsequently there was no substantial change in the course of the schooner, but that the red light made its appearance through her yawing or leeway. The original fault which created the calamity was that when the vessels were approaching each other the schooner's green light being nearly straight ahead, the steamer, in the language of the district judge, "did not in her maneuvers allow a sufficient margin for passing the schooner, nor for the usual and necessary variation in her course" through yawing or leeway. The vessels were on nearly opposite courses. The steamer was eastward of the schooner, and proceeded too closely, upon the supposition that the sailing vessel would continue to run with precision. The decrees of the district court are affirmed, but without costs of either court.